**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **MICHAEL W. GLASBY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 15-cv-355-TLW |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**OPINION AND ORDER**

Plaintiff Michael W. Glasby seeks judicial review of the decision of the Commissioner of the Social Security Administration denying his claim for disability insurance benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3). In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. 8). Any appeal of this decision will be directly to the Tenth Circuit Court of Appeals.

**INTRODUCTION**

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute

its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## ISSUE

On appeal, plaintiff raises one issue: whether the ALJ improperly rejected the opinions (the Physical Medical Source Statements) of his treating physicians. (Dkt. 17).

## DISCUSSION

Plaintiff develops two arguments in his opening brief: (1) that "the ALJ's decision is legally deficient because he never stated whether or not the opinion[s of his treating physicians were] supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) that "the ALJ did not give the opinion[s] of his treating physicians, Dr. Okada and Dr. Karpman,] deference nor did he provide specific legitimate reasons for rejecting th[eir] opinion[s]." (Dkt. 17 at 6, 8).

Ordinarily, a treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); see also Hackett v. Barnhart, 395 F.3d at 1173-74 (citing Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003)). If the ALJ discounts or rejects a treating physician opinion, he is required to explain his reasoning for so doing. See Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987) (stating that an ALJ must give specific, legitimate reasons for disregarding a treating physician's opinion); Thomas v. Barnhart, 147 F. App'x 755, 760 (10th Cir. 2005) (holding that an ALJ must give "adequate reasons" for rejecting an examining physician's opinion and adopting a non-examining physician's opinion).

The analysis of a treating physician's opinion is sequential. First, the ALJ must determine whether the opinion qualifies for "controlling weight," by determining whether it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether it is consistent with the other substantial evidence in the administrative record. <u>Watkins</u>, 350 F.3d at 1300. If the answer is "no" to the first part of the inquiry, then the analysis is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. <u>Id.</u> "[I]f the opinion is deficient <u>in either of these respects</u>, then it is not entitled to controlling weight." <u>Id.</u> (emphasis added).

Plaintiff only argues that the ALJ failed to consider whether the Physical Medical Source Statements of Dr. Okada and Dr. Karpman are well-supported by medically acceptable clinical and laboratory diagnostic techniques. In this respect, plaintiff is correct. The ALJ does not address this factor in his decision. However, plaintiff does not assert that the ALJ improperly concluded that the Physical Medical Source Statements are inconsistent with other substantial evidence in the record. Since the failure of a treating physician opinion to satisfy either factor means that the opinion is not entitled to controlling weight, an ALJ need only consider one if the factor the ALJ considers is deficient. Thus, once an ALJ makes the determination that the opinions of a treating physician are inconsistent with other substantial evidence in the record, those opinions are not entitled to controlling weight, irrespective of whether they are well-supported by acceptable clinical and laboratory diagnostic techniques. That is precisely what occurred here.[1]

---

[1] Even had plaintiff made this argument, it would not have been persuasive. The Court has reviewed this aspect of the ALJ's decision and determined that the ALJ did not err in determining that there is substantial evidence in the record which is inconsistent with the Physical Medical Source Statements of plaintiff's treating physicians.

However, even if the ALJ finds the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the record, treating physician opinions are still entitled to deference and must be evaluated in reference to the factors enumerated in 20 C.F.R. § 404.1527. Those factors are as follows:

> (1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Watkins, 350 F.3d at 1301 (citing Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)). The ALJ must give good reasons in his decision for the weight he ultimately assigns the opinion. Id. (citing 20 C.F.R. § 404.1527(d)(2)). The reasons must be of sufficient specificity to make clear to any subsequent reviewers the weight the adjudicator gave to the treating physician's opinion and the reasons for that weight. See Andersen v. Astrue, 319 F. App'x 712, 717 (10th Cir. 2009) (unpublished).[2]

The ALJ gave the Physical Medical Source Statements of Dr. Okada and Dr. Karpman "little weight,"

> I give little weight to the Physical Medical Source Statements completed by Dr. Okada on February 27, 2013, and Dr. Karpman on March 19, 2013. (Exhibit 33F/35F), as Mr. Glasby's actual activities demonstrate his ability to work more than set forth in their Physical Medical Source Statements and, as previously stated, their statements appear to be inconsistent with their own treatment notes. In fact, when seen at St. Francis Hospital on June 14, 2011, Mr. Glasby's heart medications were adjusted and Mr. Glasby admitted he had "not seen his cardiologist in around two years." At that time, the physician stated, Mr. Glasby has been noncompliant with taking his medications and seeing his physicians, as

---

[2] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

>an outpatient. (Exhibit 3F, pages 3-8). Also, as previously stated, when seen by Dr. Okada on July 25, 2011, he noted medical noncompliance, stating Mr. Glasby has "stopped medication, been a no show, and has not had his device checked." (Exhibit 6F, pages 3-6).

(R. 169).[3] These reasons are certainly specific enough "to make clear to any subsequent reviewers the weight the adjudicator gave to the treating physician's opinion and the reasons for that weight." Andersen, 319 F. App'x at 717. In addition, earlier in his decision, the ALJ thoroughly reviewed plaintiff's longitudinal medical history and noted a number of findings which are inconsistent with the Physical Medical Source Statements of Dr. Okada and Dr. Karpman.

The ALJ's analysis, however, is not entirely supported by the evidence. The ALJ relies heavily on plaintiff's non-compliance as proof that plaintiff was able to do more than the Medical Source Statements indicated. (R. 169). As plaintiff points out in his initial brief, however, these instances of non-compliance occurred prior to plaintiff's amended disability onset date of January 1, 2012.[4] (Dkt. 17; R. 151, 169).

The ALJ's second reason for giving little weight to the Medical Source Statements was that the opinions were inconsistent with the doctors' treatment notes. (R. 169). Dr. Okada treated plaintiff sporadically from June 2011 through August 2012. (R. 467-79, 538-74, 915-86). Part of that treatment relationship occurred prior to plaintiff's amended onset date, including a transthoracic echocardiogram performed at St. Francis Hospital in June 2011 that showed "an

---

[3] Exhibit 3F contains the treatment notes of Dr. Christopher J. Pitcock. Those notes state, "The patient was known to be noncompliant with taking his medications at home as well as seeing his physicians as an outpatient. . . . The patient did admit to not seeing his cardiologist probably for around 2 years. . . . By the time he was discharged out of the hospital, he was in normal sinus rhythm. He had no active chest pain or shortness of breath. His weakness was improving as he ambulated around the halls with physical therapy. He was tolerating his new medications relatively well." (R. 469-70). Exhibit 6F contains treatment notes from Dr. Okada, "Medical non compliance. He has stopped medication, been a no show, and has not had his device checked." (R. 542).

[4] The hearing transcript indicates that plaintiff amended his onset date to November 1, 2011. (R. 180). However, for purposes of the analysis, this error in the onset date is not dispositive.

5

ejection fraction calculated to be around 20 to 25%." (R. 469). That test was provided to Dr. Okada, who saw plaintiff for follow-up treatment in July 2011. (R. 470, 538-43). At the July 2011 appointment, Dr. Okada noted that plaintiff was non-compliant because he had "stopped medication, been a no show, and has not had his device checked." (R. 542). Dr. Okada modified plaintiff's medication and scheduled him for a three-month check of his Implantable Cardioverter Defibrillator ("pacemaker"). (R. 541). Plaintiff kept that appointment in September 2011. (R. 544-67). Thereafter, plaintiff had his pacemaker checked in March 2012 and then returned to see Dr. Okada in July 2012. (R. 915-86). Thereafter, plaintiff had an electrocardiogram test and limited echocardiogram in August 2012 with Dr. Okada. (R. 937, 940-42). The electrocardiogram was abnormal (R. 937), but the limited echocardiogram revealed an ejection fraction of 50%, which indicated "low normal" function of the left ventricle. (R. 940). Plaintiff last saw Dr. Okada for a pacemaker check in October 2012. (R. 915).

Dr. Okada then completed his Medical Source Statement in February 2013. (R. 1004-05). In it, Dr. Okada relied only on the June 2011 echocardiogram which showed ejection fraction of 20-25%. (R. 1005). Dr. Okada did not reference the results of the multiple pacemaker checks or the limited echocardiogram from August 2012 which showed an ejection fraction of 50%. Accordingly, the ALJ finding that Dr. Okada's Medical Source Statement was inconsistent with his treatment notes is supported by substantial evidence.

Plaintiff subsequently sought treatment at OSU Physicians beginning January 2013 after being hospitalized with leg pain in December 2012. (R. 995, 997-1003). At that time, Dr. Karpman became plaintiff's cardiologist. (R. 1014). In January 2013, Dr. Karpman examined plaintiff and determined that his "ejection fraction is 35% or less" but plaintiff showed "[n]o congestive heart failure manifestations." (R. 1020). Dr. Karpman wanted to perform another echocardiogram, but

6

plaintiff did not "want to pay for it." Id. Dr. Karpman opined that plaintiff's "[l]ong term prognosis [was] poor" and stated that he would eventually refer plaintiff to Oklahoma City for a heart transplant evaluation. Id.

In February 2013, plaintiff reported that his complaints of daily dizziness and chest pain remained unchanged, but he was experiencing shortness of breath as a new symptom. (R. 1006). At the time of the examination, plaintiff was not experiencing dizziness, chest pain or shortness of breath. (R. 1007-09). The examination also revealed no signs of edema. (R. 1008). The following month, however, plaintiff stated that his health had declined significantly. (R. 1014). He reported shortness of breath after walking 10-15 feet and feeling that his legs were "shaky." Id. Plaintiff's examination was positive for chest pain, edema, and joint pain. (R. 1015). Dr. Karpman also detected "II/VI systolic ejection murmur heard at the base" when listening to plaintiff's heart. Id. He concluded that plaintiff's "ejection fraction is 35% or less" and that plaintiff's condition was worsening. (R. 1016). Plaintiff again refused an echocardiogram or additional testing because he could not afford it. Id. Because plaintiff was unable to tolerate Lasix, Dr. Karpman could not increase plaintiff's medication to control his symptoms. Id. At that time, Dr. Karpman concluded that it was necessary to refer plaintiff to Oklahoma City for a heart transplant evaluation. Id. Dr. Karpman completed the Medical Source Statement at this time. (R. 1012-13).

Unlike Dr. Okada's treatment notes, which show relative stability of plaintiff's congestive heart failure, Dr. Karpman's treatment notes indicate a rapid and steep decline in plaintiff's health between January and March 2013. Therefore, the ALJ's finding that Dr. Karpman's treatment notes are inconsistent with his Medical Source Statement is not supported by substantial evidence.

Overall, the ALJ's analysis of the medical evidence is proper, and it is apparent that plaintiff was able to manage his heart conditions – congestive heart failure, atrial fibrillation, and

hypertension – for most of the relevant time period. However, the ALJ's analysis appears to conflate these different heart conditions and does not take into account plaintiff's deteriorating condition beginning in early 2013. This is not a case in which a treating physician treats a chronic condition conservatively and then submits a medical source statement outlining limitations far in excess of what is reasonable in light of that conservative treatment. Instead, the medical records present a longitudinal view of plaintiff's health. The increase in symptoms is consistent with the progressive nature of his diagnosis, and for that reason, the Court cannot conclude that the ALJ's analysis of Dr. Karpman's opinion is consistent with the medical evidence or, more importantly, supported by substantial evidence. The ALJ's error in this case appears to be a failure to recognize the decline, so while the Court agrees that plaintiff was not disabled on his alleged onset date, it appears that he may have become disabled or at least more limited in his RFC in the months just before the ALJ held a hearing and issued a decision.

## CONCLUSION

Accordingly, the ALJ's decision finding plaintiff not disabled is hereby **REVERSED AND REMANDED** for additional proceedings. On remand, the ALJ should re-evaluate Dr. Karpman's opinion to determine whether plaintiff retained the RFC to perform a limited range of sedentary work or whether his worsening symptoms eliminated his ability to perform competitive work at some point during the relevant time period.

Additionally, because the Court finds that the ALJ correctly evaluated the evidence for most of the relevant time period and that a reasonable advocate could view the ALJ's analysis of even Dr. Karpman's opinion as supported by substantial evidence, the Court also finds that the Commissioner's position in defending the ALJ's decision was substantially justified.

SO ORDERED this 30th day of September, 2016.

_____
T. Lane Wilson
United States Magistrate Judge

9